Case number 22-1968, the United States of America v. Johnny Ho. Oral argument not to exceed 15 minutes per side. Mr. Foster, you may proceed for the appellant. Thank you. Good morning. Mitch Foster for Johnny Ho. I would like to reserve two minutes for rebuttal. So we've got two major issues and I'd like to try to spend equal time on both of them. A lot of times when... I'll tell you if you're going to spend a lot of time on the voir dire one, I've got a lot of skepticism that that's outside the discretion of the district court. I mean, I've only done one voir dire myself, but it seems hard to manage and may not have been the best practice, but it didn't seem like an outrageously problematic practice. Well, I respectfully disagree. I think the case law is very kind of general on these principles of, you know, you just have to see if there's a fair and impartial juror. So when attorneys pick a jury, a lot of times they just do all the talking and they like to hear themselves speak and they might impress the jurors and everyone in the courtroom, but you don't... That's not required, though. The judge can always ask all the questions. Well, yes, yes. I'm just making a point about getting information from the jurors. So just like attorneys do all the talking, a lot of them, they're very good, they're very polished, but they don't learn anything about the jurors. When judges do all the questioning, it may be permitted, it's not the best practice, but you don't... If they're doing all the talking and the jurors just don't answer or don't raise their hand, then what do you learn about the jurors? It's like the question was never asked. Well, I learned that no one has a positive answer to the points the district court judge said. And I agree with you that there are appropriate questions for this group questioning, like has anyone ever been on a jury before? Five people raise their hand and then they'll tell about it. Has anyone ever applied for a PPP loan? Has anyone been a victim of a crime? These are things that are based on facts and experiences that the jurors will have a ready answer. What are the best questions for your case that were asked that the failure to raise a hand was an ambiguous response? I'm going to get to... That's exactly where I'm going next, thank you. Answer the question then. I identified like five of them. Okay, what are they? The first one is, and I objected right after this, it's like, and if you're in trial, would you be willing to be tried by a jury with someone who has the same frame of mind as yours? That calls for a yes or no question. No juror answered that question. Next one is... Wait, wait, wait, just to make sure I'm getting it. You're making the point that was complicated for them to figure out if that requires a hand raise or not. Is that the point you're getting at? No, no, I disagree. Tell me the point you're trying to make with this, why that question in response to Judge Bush. If you could just explain a little bit why this was on your list. Because would you want someone like you to be a juror on your case if you were on trial? Yes I would, no I wouldn't. Those are the two options. Remaining silent is not answering the question. So you're getting to the point that hand raising is not an appropriate response to this kind of question. If you raise your hand... Your hand is not a yes response. A yes or a no. Yeah, right, that's what I thought you meant. Okay, I got it, so keep going then. The next one is, do you understand A, B, and C? I didn't write down what it was, but do you understand? No answer to that question. That calls for a yes or no question. I didn't learn anything. Mr. Ho, Johnny Ho, didn't learn anything about that. Any of those jurors with response to that do you understand question. But I, actually if I'm listening to that, I'm thinking I don't raise my hand unless I have a problem, I need more explanation. That's what I, that's what that would seem to be. But if they're silent, how do you know? Like, well I don't understand, but, you know, I understand. Everyone should say yes. The transcript should say yes. Does the judge at any point, the magistrate judge, say you should raise your hand if you're, is there any instruction about raising hands? I don't think she did, but I'm not certain. I'd have to double check the transcript. But he certainly wasn't running it in a way where he was prohibiting people from asking questions. People meaning the attorneys from asking questions? No, the voir dire, the veneer. I don't think there was ever any opportunity, like, does anyone have any questions? There might have been, like, does anyone have a comment about whether they could be fair at the very end? And I don't think anyone raised their hand about that. So I guess they, she did open the door to that. Can I just make the point that, you know, I only did this once and I did it just the way he did it. So maybe this suggests a built-in bias in this case, so forgive me. But I guess I would have thought the way this works is once the judge says, I'm doing the talking here. You guys are observing. Here's how I'm going to do it. Rather than asking everyone individually, we're going to do hand raises. It's a little more efficient. I can't believe the judge was meaning to say that if you thought a question really couldn't be answered with hand raised or not hand raised, you wouldn't be allowed to say, okay, judge, I get what you're doing. But as to that question, I mean, in other words, did you point out as to some of the questions, they didn't really work with the hand raising approach? Yes, yes, I did do an objection. It was at a sidebar. And it was after the one, how would you feel if someone like yourself was in the jury? And then after that, the objection was denied because she said, I haven't seen any of them hesitate to raise their hand. And then after that, she asked about seven or eight more questions that called for a yes or no answer. Including, do you agree to abide by these instructions? None of the jurors even answered that question if they would agree to abide by her instructions. And then, have you heard any news reports about fraud regarding PPP or SBA loans? And no one answered that question. And then the follow-up within the same question was a compound question. If so, would hearing these reports make it hard for you to sit as a fair and impartial juror on the case? So we don't know if they heard any news reports. And even if they did, we don't know if they could be fair because it was a yes or no question. On both subparts of that question, it wasn't answered. So how do I know? So tell me, what is your objection on appeal? Is your objection on appeal the general approach? Or the times there was a question that really could not be answered by hand raising and you objected? And was it the magistrate that did the voir dire? The magistrate, Judge. Okay. So what is the point you're making on appeal? Is it the specific ones where you said this particular question can't be answered through raising hand or not? Or is it just the general approach? Well, it's both, Judge Sutton, and I appreciate that distinction. I think specifically to get a new trial on Johnny Ho's case, all of those eight questions that I identified that called for a specific yes or no answer that were not answered gave me absolutely no knowledge from which to use my preemptory challenges. So that's the main specific issue. But in general, the process, and I know you said you did it, and I would respectfully say that that's a horrible process. I don't mean to be negative, but I'm being blunt. I've picked a lot of juries, and the best practice is for someone to ask, how do you feel about this, jury number one? Let them talk. Let them give you information. Jury number seven, do you agree with this? No, I don't. And here's why. Why? Tell us why. Then you learn about it. Was there any dialogue with the magistrate judge about, was there any opportunity for the lawyers to ask questions after the general voir dire? No, absolutely not. And when you objected to that one question, did you, after that series of questions, did you object that you don't know how the jury would answer, for instance, well, I guess can you be fair is pretty, but you didn't know their answers to a series of questions that you thought were important. Not specifically, but at the time, during the first objection, there was some colloquy between myself, the judge, and the two attorneys that I was up against. And I did make the point, well, but if they don't, but if it's the answer to no question and they don't say anything, they didn't answer the question. So I made that point and I considered that a standing objection that I think should suffice to handle all of the improper questions that were asked after my objection. Okay. So I see I only have about three and a half minutes. Would I be permitted extra time or should I move on to the other issue? Move on. Move, move, move. Okay. Well, so this is more of an evidentiary question. I think the judge was wrong about not allowing me to present the private investigator. And she said it was one step removed away from one extra step. But I think just the opposite is true. Here we have a case where Antonio George was the main perpetrator in this four-plus-million-dollar fraud conspiracy. And he had a history of preparing false tax returns, inflating business expenses on people's tax returns and get a higher refund. And these expenses didn't exist. So, but anyway, the IRS investigated him. But during this process. Can I ask you one quick question, harmless error? I mean, it is a little peripheral whether we call it one, two, three steps removed. It's going to the other person, not the defendant. And we do have some pretty problematic stuff for what the defendant did. Clearly some falsities. I think you have to accept that. And then accepting kickbacks at the end. Well, let me explain. And I appreciate that. First of all, on the harmless error, I think the process of the steps away is important. Statements these taxpayers made to the IRS investigators. The IRS investigators wrote a report. And then the report was read into evidence by a witness, by the case agent that was for the government. So that's three steps. Here, my investigator interviewed these taxpayers. They told her what they did. And then she was prepared to testify. That's only two steps. And she's under oath, which is different than just reading a report. And the focus of those IRS reports was not necessarily to get to the heart of, okay, what was going on with these taxpayers? If they didn't know, were they involved? Did they know? Was it like, okay, this guy's going to get you a lot of money. You don't even have to really spend a lot of time to look at those reports. Maybe they're in on it. But the focus wasn't on whether they knew. The focus was on whether their returns were accurate. Because they weren't the target. Antonio George, the taxpayer. So you're saying that had your people or your investigator been allowed to testify, that there would have been more evidence that the other clients didn't know, did not know that he was submitting false returns? Right. That's the fact. But there was some evidence that he was submitting false returns they didn't know about from the IRS report, right? I think at best it would be implied, indirect. Here we have an investigator asking the specific question. But you're going to the knowledge of these other people of whether they knew of what this person was doing. And that's like removed from what's going on in the case itself, which is whether your client knew of what this guy was doing. I'm failing to see what the link is here. Because you seem to be showing this as propensity, that he has this propensity to do things that his clients don't know about. Is that what you're trying to prove? No, no. I appreciate the question, Judge Bush. But the propensity is not the argument. It's more of a 404B. It's this person's common plan or scheme, a way of doing business, that is admissible under 404B. And Mr. Ho has a due process right to present a defense. And he was denied that right rather than sworn testimony by someone that just within a couple days interviewed these witnesses who took the fifth and weren't available. Did you make that argument at trial that it was plan evidence? Yes, yes. I think I wanted to point that out. I appreciate that question, Judge White. In the appellee brief, they did point out that it was more for impeachment and it was for propensity. And in my motion in response to a motion in limine. Why don't you tell us this on rebuttal? So we'll let the government go and then you can give us the citation and answer Judge White's question on rebuttal so you have the information. It was just for a pattern. I got the cite on what I filed and I'll get to that later. Appreciate it. Thank you. Okay, we'll hear from the government. Good morning. Good morning, Your Honor. May it please the Court. Ben Hurst for the United States. This Court should affirm on both issues presented for review. I'd like to take up the second issue, the evidentiary issue first, and I'd actually like to lead with the harmless error questions that were addressed here. The evidence that Ho sought to admit was introduced to attempt to show that these taxpayers in an unrelated tax fraud were not complicit in George's submission of tax returns on their behalf. And he offered that to show his own knowledge and that he had an innocent mind with respect to the tax fraud issue in this case. This evidence... It was part of a plan. His modus operandi or whatever. Yes, Your Honor. That's the claim that was made. Here it doesn't really go, though. That's not actually what he's trying to get at. What he's trying to get at is his own state of mind, which is one step removed from whatever conduct that George undertook in the unrelated tax fraud and here in the PPP and EIDL fraud. There's no real connection between the taxpayer's states of mind in those cases. Their state of mind is what they were told. Just as a threshold question, did any of these other proposed witnesses have filed for the CARES, under the CARES Act, have made claims for any of those benefits? Your Honor is asking about the three taxpayers who invoked. Yes. Okay. Not to my knowledge, Your Honor. That was not in the record anywhere that they did. So what he's arguing is that his plan, his scheme, was to commit this tax fraud without the knowledge of the people whose taxes he was preparing. That's correct. He's offering this extrinsic evidence on that collateral question of the taxpayer's knowledge, but it doesn't follow that those taxpayers lacked knowledge, assuming that that is what this evidence shows. It doesn't follow that Ho was not complicit in this case. Well, it doesn't. There's no evidence. It doesn't. Well, that's right. But, Your Honor, it doesn't make Ho's complicity in this case more or less likely. It does. If you have somebody who goes around, if you have an accountant that goes around committing tax fraud by filing fraudulent returns without the taxpayer knowing, I mean, if he's done it. I mean, it could be an accountant who said, you know, like, I always get you a refund, but he doesn't tell them, you know, that he's committing fraud to always get the refund. And, Your Honor, if this were a tax fraud case, and the facts in this case were Johnny Ho went to the tax wolf and sought to have his tax returns prepared, just like those other taxpayers did, then I think maybe there's a logical implication that could be drawn, but that's not what happened in this case. What happened in this case is that Johnny Ho filed two false PPP loan applications before George was ever involved. In both of those, he claimed that he had employees. He claimed that he had payroll. And as he admitted at trial, neither of those statements, I mean, he admitted at trial he didn't have payroll. He didn't have employees. It was only when the third case, the third question, a PPP application came up. He says, I'm going to go get help from George now. At that point, George offered to prepare some documents for him, but Ho admitted to the IRS investigator that he knew the documents he submitted with his third, I'm sorry, with the FBI investigator, that he knew those documents that he submitted with his third PPP application were not the documents of his business. So this is just, to say that there is a linkage or a logical relationship here, it just, it's too far. Tell me if we think of this as plan evidence, how much of it was already before the jury through the memo? Certainly, Your Honor. That's another reason why this evidence was harmless. It would have been cumulative, or the exclusion of this evidence was harmless. It would have been cumulative to what was in the IRS reports. We have the IRS, in the IRS reports of the three taxpayers, the first taxpayer says, all of the taxpayers say the Schedule C's that George presented for them were false. And they say, one of them says, I didn't review that with him. It was clear from the IRS reports that they were contesting their complicity and that they were expressing surprise, one expressed surprise. And in fact, in my friend's closing argument, he relies on that third IRS report to make the argument that he's making now for why this evidence would be relevant. So comparing those IRS reports, which were admitted to the jury and argued by a defense counsel, with the proffered testimony from the defense investigator, it's just too hard to find any kind of marginal difference that would justify finding, one, that there's relevance here, two, that it would overcome a 403 balancing test that would be required under 404B. Because here, you would have not just, whatever marginal probative value there would be, would be substantially outweighed by the risk of confusing the jury with a mini trial about an unrelated tax fraud. Taxpayer witnesses who had no other role to play in this case, all of that would have been another reason to exclude this evidence. And then, of course, it's harmless to exclude it, one, because it is cumulative, as we've discussed, and two, because the evidence of the fraud here and Ho's complicity in the fraud was overwhelming. We've discussed the other false statements that Ho made before George was involved. Your Honor asked a question about the kickbacks. After the PPP proceeds came in, Ho went to a payroll processor and had them sent to George's companies, but those companies weren't affiliated with Ho's enterprise at all. That wasn't a proper use that shows his complicity. And then, with respect to the EIDL fraud, Ho had his brother-in-law sign or represented him as the owner of this company. He didn't have an affiliation with that company. And Ho opened a bank account and represented himself as a president of that company. He didn't have an affiliation with that company. Once again, directed the proceeds to George's companies, which were not employees of Ho's enterprise. So, for those reasons, it should not have been admitted, and it was, in any event, cumulative and harmless in light of the overwhelming evidence. So, do you know, did he keep his business open during COVID? The testimony, so Ho took the stand. His testimony on when he took the stand was that he closed it, I think when the pandemic started. I don't know exactly when that was. And then reopened in June of 2020. But he also stated that at the time he made these disbursements, he didn't have any employees or payroll, so he didn't have a need for a payroll processor. Indicates to me that through that period, several months up to June 2020, he was not operating a business. Well, he didn't have employees because they were independent contractors. That's correct, Your Honor. And for that reason, they would not have been eligible for him to account for them as part of a PPP application. So that's another reason why his statements in those first two PPP applications were not correct. Okay, and then what about the voir dire? I mean, those are yes-no questions and no one is... I mean, what information was gleaned from those questions if they're not being answered? Your Honor, several responses to that question. The vast majority of these questions call for a yes response if there is an affirmative response. And Your Honor, I think I asked about an instruction from the judge. That was the judge's instruction. She said, I'm going to ask you a series of questions. I'm paraphrasing, I shouldn't. There's a whole series of other questions I'm going to ask you collectively. If you have a comment or want to add something or want to respond to this, any of these questions I ask, you raise your hand and we'll pass a microphone for you. She repeats that instruction throughout. But how is it voluntary to respond to some of those questions? Like, if you want to respond. I mean, can you be fair and impartial? Yes-no question. And if you leave it up to the jurors to respond, someone can sit there and go, I don't feel like responding. But we don't know if they can be fair and impartial. Your Honor, that is not how I take the judge's instruction. In fact, the judge made a finding, a fact, that the jurors were responsive to her questions. Furthermore, this is an approach that is very common. Courts have repeatedly affirmed the use of collective questioning, even when the questions are structured in this kind of occasionally different way. And there's no case cited to the contrary in my friend's brief explaining why this, or any court has ever held, that individual voir dire is required under circumstances like these. This is also, as the court has recognized, this is a question, the performance of voir dire, that's well within the discretion, consigned to the discretion of the voir direing judge. And for that reason, and those reasons, this is something that shouldn't be dealt into, shouldn't be questioned, in the magistrate judge's finding and the instructions that she gave here. But taking just, I think, one more point on a response to Your Honor's question about the yes or no questions. These are, everyone who is in the jury room understood what the magistrate judge was asking them to do. That's consistent with the judge's finding. We have 19 of the voir dire members who affirmatively raised their hands in response to her question. In light of that, all of the people in the veneer room observing one another in this behavior and the judge's instructions, it's entirely fair to infer that those who do not raise their hand in response to her question are intending a negative response to that question. And is that a finding of fact by the magistrate judge? The judge found that the jurors had not hesitated to respond to her questions and were being responsive. In our view, that's a finding of fact that would be subject to clearer review. And it's amply supported by the record, as we've discussed. I don't have anything additional to present. I'm happy to take additional questions. Otherwise, I'm prepared to rest on my brief. We'd ask the Court to affirm. Thank you, Mr. Durst. And Mr. Foster, give your two minutes of rebuttal. Thank you. First of all, Johnny Ho, when they say he admitted to the FBI agent on cross-examination, I asked, well, what if he knew the information after the fact and learned it after Antonio George got arrested and that's when he admitted to the FBI it was false? And he conceded, yeah, that could have been the case. So that tells you that the FBI wasn't really specific enough with the questions asked when Ho knew. So that was an important factual point I wanted to point out. Also, no marginal difference with regard to the IRS reports or the proposed testimony by the defense investigator. I strongly disagree with that. The IRS investigators never asked the taxpayers, did you know it was fraudulent at the time it was submitted? Because they weren't the target. So they didn't ask those specific questions. Did you know? So those taxpayers never answered it. You can only imply from their answers that that's not strong enough and that deprives Ho of a due process right to present a defense. The defense was Ho was acting in Antonio George's direction and maybe you say, well, that's unbelievable. He must have known. And maybe he should have known better. Maybe he should have known something unsavory was going on here and he just took a blind eye to it. But that wasn't the standard. He didn't know. And the jury would have had a better time understanding that argument if the defense investigator would have been able to say this is a pattern, it's a standard. So now we can put more strength behind that defense argument because Antonio George has a longstanding pattern of doing this and those IRS reports just weren't enough. And in terms of independent contractors, Ho actually thought that, yes, he could claim his independent contractors as employees and it wasn't until trial when the prosecutor's expert on SBA loans and PPP explained that, yes, independent contractors, they'd have to each apply for a PPP loan on their own. Finally, with regard to the voir dire, the wealth of information, the demographic things, that's only helpful if you like generalizing. I don't want jurors with children. I don't want jurors that are married. I don't want jurors that listen to a certain news channel or have a bumper sticker. But that's a generalization and you're often wrong. I'll ask you a question if you don't mind. Of the questions asked of the veneer, how many were from the counsel? Were they all provided by counsel or were they from the judge? Or kind of a mix of both? If I answer that question, it would be what I recall that wasn't part of the record and I can do that for you. We did have a pretrial meeting where we discussed. So my brother counsel may be at a disadvantage, but as an officer of the court, I can say that this was I recall. Would you like that answer? It's not on the record, so I guess it's not deemed relevant. So I'll withdraw my question. Were you allowed to submit questions? Yes. I submitted about 20 questions. And I can tell you how many the judge allowed if you let me answer. I don't think it's relevant. I think we're good. Can I make one last point? Briefly with very few dependent clauses. Yes. The one of your questions, I think it was Judge Bush asked, was this a factual finding by the judge? Were they allowed to answer the questions? And then it was whether there was a clear error. And there was a clear error because in his brief, he mentions that 34% of the questions they didn't answer. So that meant the rest did answer or raise their hand or something. So a full over one-third of the jurors never answered a single question other than those demographic questions that call for generalizations. So one-third of that panel, I was completely blind to exercising my peremptory challenges, and that denied Johnny Ho a fair trial. Okay. Thank you very much. Thank you. We appreciate both of your written briefs and your arguments. Mr. Foster, I see you're court-appointed counsel. Mr. Ho is really fortunate to have you, and we really appreciate your service to the court. Thank you.  All right. Thanks to both of you. The case will be submitted.